The third case on the oral argument calendar, which is Hoover v. Newland. May it please the Court. Peggy Ruffray for Petitioner in this case. Your Honor, it's the State's position that Hoover's conviction for first-degree murder was absolutely valid. There were no grounds for granting the writ. His mental state was fully explored at trial by five different psychiatric experts, whose testimony spanned more than 600 pages. But the jury rejected the insanity defense because there was extremely strong evidence that he was sane at the time of the crime. The magistrate's order granting the writ was replete with errors and was wrong on both points. On the first point of the insanity instruction, the magistrate judge failed to give sufficient deference to the State court's finding that the instruction did not amount to a Federal due process violation. And if you look at the prong of the Hoover had to show that he was incapable of distinguishing right from wrong. His own statements clearly show that he understood right from wrong at the time of the crime. And I think it's important to actually review what those statements were, because I'm quoting the defendant. There is some profanity involved, but I think it's very significant. He said the victim is named Baldwin. He said, I kept thinking Baldwin is the guy standing between me and money. It made me excited. I thought about guns I could buy and all the other stuff. I knew it was wrong, but I didn't give a shit. He also said that killing is as easy as brushing your teeth. It takes just a few minutes, but it fucks with your conscience. He also said that he was uneasy from the moment of the killing, like there were butterflies in his stomach. And he also said, before I killed him, I thought about it, but I thought about money more. Now, the State court found that those statements from Hoover's own mouth were so significant that any error could not possibly have been harmful. And it's our position that that was not unreasonable under the ADPA deferential standard that this Court must apply. The magistrate judge discounted Hoover's own statements in his analysis, and he focused only on the one statement to Dr. French, even though there were several other statements that were equally compelling. He relied on Dr. French's report, which was not in front of the jury, not in front of the State court. So that was clearly an error. And Dr. French didn't even offer an opinion at trial on sanity. He simply testified at the guilt phase and offered the opinion that Hoover had a mental disorder. So when you look at this, the State court gave more weight to Hoover's statements in finding that he knew right from wrong. The magistrate judge gave more weight to the defense psychiatric testimony. But under the ADPA deferential standard, when you have a judgment call like that, unless it's actually unreasonable, the State must prevail. And it's our position that it was absolutely reasonable for the State court to find that these statements that I have just quoted showed that Hoover knew right from wrong at the time of the killing. Now, I'd also like to address the Napui violation, because the magistrate judge made some very serious accusations against the prosecutor that we believe are totally unfounded. He found that the prosecutor knowingly presented false evidence by failing to give the court-appointed expert, Dr. Buehler, some unspecified background materials about this Pendragon plot. And it's not even clear what exactly the magistrate judge believed should have been given to him. Apparently, some of the maps that the co-defendant Richards, who was tried at the separate trial, that he had developed as part of this plot, but it's never even specified what materials should have been given. Now, here are the errors in that part of the magistrate judge's analysis. First of all, no other expert reviewed those materials either. Five mental health experts testified. None of them reviewed those materials. So it's baffling how it could suddenly have become a Napui violation for the prosecutor not to give those materials to just one of them. Second, Dr. Buehler was not unfamiliar with Pendragon. The magistrate judge misread the record when he made that statement. Dr. Buehler had reviewed more than any other expert. He said he had reviewed 700 pages of records. He had read all the other psychiatric reports. He had read the testimony of three witnesses who testified at the trial about Pendragon. He had personally interviewed Mr. Hoover about Pendragon. So he clearly was very familiar with this Pendragon plot. Whether or not he had seen these maps, he knew all about it. Third, Dr. Buehler's diagnosis was not out of line with all of the other experts. The other court-appointed experts, there were two court-appointed experts, Buehler and Rodriguez, both testified at the sanity face, both agreed that Hoover was sane. Those were the court-appointed experts. Only one doctor testified that Hoover was insane, and the others offered no opinion. If anybody's opinion was out of line, it was Dr. Rodriguez, the defense psychiatrist who testified that he believed on a limb and was the only one that found that Hoover was ever psychotic. All of the other doctors, including the defense psychiatrist, testified specifically they did not believe that Hoover was ever psychotic. Now, there were some disagreements about the specific mental disorder that Hoover might have been suffering from, but Dr. Gould, who was, again, one of the defense psychiatrists, he explained, this is at ER 352, on the difference between borderline personality disorder and undersocialized conduct disorder. He said, if you read the reports and you don't understand very much about sophisticated psychiatric diagnoses, you would say those are two different diagnoses, but they're not. It's just that one examiner is emphasizing one aspect of the problem and the other examiner is emphasizing the other aspect of the problem, but both aspects are compatible and coexist. And Dr. Gould offered his opinion that all the diagnoses in this case were remarkably uniform and compatible. So there was simply nothing about Dr. Buehler's diagnosis that was unusual or out-of-line. And he wasn't even the only one that testified that he believed the motive for the murder was financial gain. Several of the defense psychiatrists testified to that as well. Now, fourth, Dr. Buehler did not concede that he would have changed his opinion if he had known more about Pendragon. That simply wasn't the question asked, and the magistrate judge misread the record. Number five, a psychiatric opinion can't be false testimony. Dr. Buehler reached his opinion based on all these 700 pages of records and everything else that he had. He reached the opinion that Hoover was saying. It's unexplained how that could be false, because it's an opinion. Number six, the DA did not knowingly manipulate any evidence. Both the DA and the defense attorney gave this court-appointed expert, Dr. Buehler, materials. So both had the opportunity to give him anything they wanted. The defense attorney didn't think it was important to give him these background materials either. So it's unclear and unexplained how the prosecutor could somehow have come up with some plan that if he didn't give these maps to Dr. Buehler, that would lead him to reach some particular opinion, and he could therefore manipulate him into some kind of an opinion. It simply doesn't even make sense. Number seven, even if all of those errors were not in the record, that evidence was not material, because the prosecutor did not, in fact, rely on inconsistent theories between the two trials. I see that I only have a few minutes left, and I'd like to reserve my time. Certainly. Good morning, and may it please the Court. Nina Wilder on behalf of Petitioner and Appellee Cross and Hoover. And I would like to step back a moment and talk about what this case is about. This case is about the severely disturbed, abused 17-year-old who comes under the influence of a cold, calculating, sociopathic, narcissistic, manipulative person, namely Mark Richards, and it is under that influence that two tragedies occur. One tragedy, clearly the most significant tragedy, is the death of Richard Baldwin, but his loss of life. But the other tragedy is the loss of Mr. Hoover's life in the sense that he has never lived an adult life. He will spend his entire life in prison. And it is fair looking at this record to say that is true for two reasons. One, that Mr. Hoover did not have a fair chance in life, given his background. And two, that he didn't have a really fair chance at this trial for a variety of reasons, some of which rise to constitutional level and some of which not, including the fact that this was an extremely skilled, cagey prosecutor on one side, and it's not an ineffective, at least a very ineffectual attorney on the other side, who did not even have the sense to look at that instruction, the McNaughton instruction, and realize what the Skinner court saw as soon as it looked at the instruction, which is this is the historical wild beast instruction. This is an virtually impossible instruction that has serious constitutional consequences. His lawyer never even looked at that. The Supreme Court has never so declared, has it? Let me be clear. The Supreme Court has never said, the United States Supreme Court has never declared that this kind of instruction is unconstitutional, has it? No, it has not, Your Honor. As a matter of fact, when it decided Clark, it indicated that States have gone all kinds of ways, and at least one other State has this kind of instruction, and it didn't say there was anything wrong with that. Isn't that true? It is partially true. It is not true, however, that any other that the Supreme Court has ever looked at this instruction. It looked at a truncated instruction in Arizona, in Carvey, Arizona. It did not look at this instruction. This instruction has a history. And in doing so, it also looked at instructions or commented on the fact that some States have only the cognitive part, period. Didn't say that's wrong. Some have the moral part only, right from wrong. Some have the cognitive part only. One did anyway. And it never said, didn't say, oh, and that's wrong. It just said, you know, there's all kinds of ways of doing this, Norton. There are all kinds of ways of doing it. There's a varied background. No particular formulation has evolved into a baseline, said it, which is as much as saying we haven't decided yet whether any of this is wrong. And if that is true, then how in the world could one grant habeas on that basement? Well, although there is a 2254d1 aspect to the case, it is not that the Court's decision was contrary to established Supreme Court law. It was – there are two prongs to 2254d1. Yes. And the first prong is that the decision is contrary to established Supreme Court law. We do not contend that it is contrary to the law. The – this was brought under the ground and decided under the ground of 2254d2 that there was a misapplication of the law and that that misapplication was based on an unreasonable determination of the law, which is 2254d2. In order to avail ourselves – am I confusing the Court? The Court understands my point. There's never – we never said, and the magistrate judge never said, there is established law. It is clear under Leland and Carr that as far – that the Court has a substantial tolerance for these variations in the formula, but there is a limit to that. Well, unreasonable application has a limit, too, doesn't it? It does. You don't say it's – well, everything the Supreme Court hasn't decided, well, it's an unreasonable application. You can't really go that route, either. The fact is you've got a situation here where the court of appeal has applied the California law. It had to, which was interesting all by itself, of course. Well, it was stipulated by the courts. When California Supreme Court had to find that or means and, but that's – or and means or, but that's neither here nor there. That's California state law. So there's just nothing in here that I can see where the Supreme Court has made a pronouncement that has been unreasonably applied by the California court of appeal. And what you really need to do is tell us how so. How was it unreasonably applied? You've got to make that clear. If it is not clear from the magistrate judge's analysis, it was unreasonably applied to a large extent because they're linked. The unreasonable application and the unreasonable determination or construction of facts are allied. There's a misapplication. If one looks at the court's analysis, the magistrate judge actually accepts the standard applied by the court of appeal. And he said – and what he says is that even within that standard, if you accept the state law standard, there is a misapplication even of that law because there is a misconstruction, unreasonable construction of the facts, because the court of appeal looks at only one set of facts and ignores a whole majority of the evidence. But that's evidence that the jury considered and had to consider, and that's what the jury considered under the conjunctive formulation. The Supreme Court has never looked at the conjunctive – U.S. Supreme Court, I should be clear – has never looked at the conjunctive formulation. However, when it has been examined by the courts, it has been characterized not just by the California Supreme Court, but by prior courts all the way back to the 19th century as the wild beast instruction. That's the instruction that the jury considered, and that is the lens through which the jury considers the evidence. You get to the court of appeal, and the court of appeal looks only at this very narrow part of the evidence, evidence which contextually did not mean with every – essentially every other mental health expert who testified, and they did testify to this particular testimony, explained it, explained it in the context of the of Mr. Hoover's mental illness. They didn't take it at face value. The court disregards that. The court disregards, as the State has noted, hundreds and hundreds and hundreds and hundreds of pages of testimony from experts, testimony that the jury considered through the lens of the conjunctive instruction. And that's the problem, and that's why this is unreasonable. It is very well for the court to stand back and say, well, we can siphon out of all of this testimony some testimony that we can look at and say, oh, well, that shows he knew right from wrong, and if he knew right from wrong, we can ignore all of the testimony that questions whether he knew the nature and quality of his actions. And there was abundant testimony as to that. You have about a minute and a half left. Do you want to say anything about the other basis? Yes, I would. And I think one of the things that needs to be said about the Knapp Way issue is that it needs to be clear that at the point that Dr. Buehler is testifying, he is, in fact, the prosecution witness and has been for an extended period of time. And before he comes to court, for the first time, he goes to the prosecutor's office and sees the whole office, a war room, of materials related to Pendragon. And he doesn't really look at them. And he gets on the stand and he says two things. He says he doesn't think Richards was necessarily a bad influence on Mr. Hoover, and he doesn't think there was anything particularly wrong with Mr. Richards. And that's the focus that he was trying to get at. What did he say? Yes. Excuse me? About Mr. Richards? Yes. He said he had not been asked to make a diagnosis of Mr. Richards. That's correct. And he needed to see an awful lot more before he would make a diagnosis of Mr. Richards. That's not what he was about, isn't that what he said? Well, there's a difference, and I beg to differ. There's a difference between diagnosis and knowing that as the prosecutor argued, in fact, in Mr. Hoover's case, it doesn't take much, but it probably took more than he had. He certainly took more than he had, to recognize there's something very wrong with Mr. Richards, and that Mr. Richards was a bad influence on Mr. Hoover. Now, the prosecutor knew that wasn't right when Dr. Buehler testified to that, because the prosecutor had testified exactly the opposite at Mr. Richards' trial. I see my time is up.  Thank you, counsel. Your Honor, some of the defense psychiatrists did offer their opinions about the impact of Mr. Hoover's own statements that he knew right from wrong. But that, in and of itself, was very telling, and, of course, the jury was not obligated to accept the defense psychiatrist's testimony. They were able to evaluate those statements on their own and come to the common sense conclusion that that meant that he was capable of distinguishing right from wrong. And I think Dr. Rodriguez's testimony on this point is extremely telling. The prosecutor specifically asked him about the statement that Mr. Hoover made, I knew it was wrong, but I didn't give a shit, and there was a whole paragraph. Well, Dr. Rodriguez only talked about the beginning part of Mr. Hoover's statement and the end part of his statement. And the prosecutor then said to him, you kind of left out the middle of that quote, Doctor, and gave him another opportunity to specifically address how he could possibly find Mr. Hoover's saying in light of the fact that he said, I knew it was wrong, and Dr. Rodriguez still did not answer the question. That's at ER 717 and 718. And then the prosecutor argued that in closing argument. He said, you can't just pick and choose a phrase here and a phrase there and then come to your conclusion that Mr. Hoover is not responsible because of a mental disease or defect for the murder of Richard Baldwin. So I think that's an argument about the Rodriguez testimony. The Pew issue is that the State withheld some documents, including the autopsy report, the reports of suicide, the reports of auditory or visual hallucinations from the State psychiatrist, and therefore his testimony was incomplete. Your Honor, he was when I was that's what the Magistrate judge found. Yes. And what I was reading just then was addressing the first issue of the insanity instruction on the Napoleon violation on that particular issue. Dr. Bueller was present during Dr. Rodriguez's guilt phase testimony. So he heard all that testimony about the autopsy report, the medications, all of his background. He was completely aware of it by the time he testified at the sanity phase. Nothing was withheld from him. But he seemed to get it wrong, for example, on the suicide attempt. He declared there hadn't been a suicide attempt when, in fact, there had been. He said there had been some suicidal ideation. He was aware of the fact that Mr. Hoover had he had made some ineffectual attempt. He had, like, held a glass to his wrist. And he had made a statement, if I am found guilty and imprisoned, then I'll kill myself. Dr. Bueller didn't think that those were very significant. And that's not really unreasonable in context of the ineffectual attempts. But it. Well, he tried to hang himself, right? Correct. Correct. And it's unsure whether. So he just got that wrong. Well, he might have just gotten that wrong. But it's not a Napoleon violation. It didn't render his opinion false. There was no withholding of that. There was no deliberate attempt. The theory, though, on this, and I take your point on this. But we've applied, Nephew, to the situations in which facts are withheld from a witness. So the witness gets on and testifies in ignorance of certain facts. The testimony itself isn't untrue. But because of the withheld facts, it's the creation of a false impression. The classic one is where a secret deal is made with the witness. And you're familiar with that case, the Hayes case. And the witness isn't told of the deal. And he says, is there any deal? And he says, no, there's no deal. But instead, of course, there was a deal. It was false testimony. Now, this is a little bit different. But in theory, I think if the prosecution withholds key exculpatory evidence from its expert, don't you think that could rise to the level of a Nephew violation? Well, theoretically, it could. But that's simply not what happened here. For one thing, it would be hard to define something as exculpatory in the context of a psychiatric opinion. But, again, the defense attorney could have given Dr. Buehler anything he wanted. And I really think it bears repeating, no other expert had these materials either. So how can it suddenly be that this one expert, his testimony was somehow false? The other court-appointed expert, who also got quite a bit of materials from both the defense and the prosecution, Dr. Gutset, he also reached the conclusion that Hoover was saying. And nobody is saying that there was some kind of a violation there. So to somehow focus on Dr. Buehler seems inexplicable to me, frankly. Okay. Thank you, counsel. The case is heard. It will be submitted. Decision.
judges: Fernandez, Nelson, Thomas